Smokeless Fuel Company v. Commissioner.
Smokeless Fuel Co. v. Commissioner
Docket No. 108463.
United States Tax Court
1943 Tax Ct. Memo LEXIS 111; 2 T.C.M. (CCH) 794; T.C.M. (RIA) 43425; September 20, 1943
*111 Selden S. McNeer, Esq., and E. C. Conley, C.P.A., Huntington, W. Va., for the petitioner. Philip A. Bayer, Esq., for the respondent. SMITH Memorandum Opinion SMITH, Judge: This proceeding involves a deficiency of $33,472.23 in income tax for 1938. The only question for determination is whether petitioner was availed of during the taxable year for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being distributed within the meaning of section 102 of the Revenue Act of 1938. Another issue raised in the amended petition involving the question of whether an amount which petitioner received during the taxable year from the redemption of shares which it owned in another corporation was equivalent to the distribution of a taxable dividend was waived by petitioner at the hearing. [The Facts] Petitioner is a corporation with its principal office located in Charleston, West Virginia. It filed its return with the collector of internal revenue for the district of West Virginia. Petitioner was organized in 1902 to operaate as a coal sales agency for coal mines in southern West Virginia *112 and has continued in that business up to the present time. A few years after petitioner's organization a controlling interest in it was acquired by Justus Collins, now deceased, who served as its president and active head from 1912 until his death in 1938. A majority of petitioner's stock in 1938, 3,180 of the 4,000 shares outstanding, was owned by his estate. Four hundred shares were owned by Herman D. Everett, who has served as petitioner's president and general manager and one of petitioner's three directors since the death of Justus Collins. George R. Collins, son of Justus Collins, owned 400 shares, the estate of Lucy G. Collins (deceased daughter) owned 15 shares, and another daughter, Amy W. Venable, owned 5 shares. George R. Collins and Amy W. Venable were the other two directors. Neither of them took any active part in petitioner's affairs. George R. Collins lived continuously in Arizona from December 1936 until April 1939 on account of a protracted illness He has taken no active part in petitioner's business for a number of years. During 1938 petitioner had agency contracts with about twelve producing coal companies. Under these contracts it obligated itself to sell as *113 much of the coal produced by the companies as the market would absorb for the best price obtainable but was not obligated to accept any definite number of tons or percentage of production. It did not purchase any of the coal on its own account but merely acted as sales agent for the producing companies and received a percentage of the sales price as its commissions. Its principal function was to find the most profitable market for the various kinds and grades of coal produced by the agency mines. For this purpose it maintained a number of branch sales offices throughout its sales territory and employed a large sales organization. Petitioner sold a total of approximately 2,622,000 tons of coal in 1938. Its sales for the preceding ten years ranged from a low of approximately 2,300,000 tons in 1932 to a high of approximately 2,922,000 tons in 1929. Its total gross sales, expressed in dollars, its net profits, after Federal tax, and its dividends paid for the years 1929 to 1938, inclusive, were as follows: Dividends
Years
Gross Sales
Net Profits
Paid
1929
$6,764,819.56
[34,286.37)
$ 65,000.00
1930
6,418,330.63
87,801.32
80,000.00
1931
4,886,798.40
59,027.65
10,000.00
1932
3,870,604.79
36,912.55
10,000.00
1933
4,314,930.25
74,464.84
40,000.00
1934
6,044,641.83
164,198.58
63,000.00
1935
5,733,302.58
154,446.27
80,000.00
1936
6,856,812.44
178,565.35
180,000.00
1937
7,033,053.68
180,109.68
180,000.00
1938
6,413,572.63
113,482.56
0
*114 Under its contracts with the coal producers petitioner agrees to pay them on the 20th of each month for all coal weighed and shipped in the preceding month. In actual practice, however, petitioner often makes payments to the producers several weeks in advance of the date due. There is keen competition among the independent sales agencies, such as petitioner, for contracts with the producers and to meet this competition and to maintain its contracts all possible consideration must be shown the producers. The contracts are on a year to year basis, generally, running from April 1 to March 31 and are terminable upon 90 days' notice given before April 1. In recent years there has been a tendency on the part of the coal producers to market their coal through cooperative or ownership marketing facilities rather than through independent sales agencies like petitioner. This makes it increasingly difficult for petitioner to obtain desirable contracts. In some instances petitioner agrees to prepay the freight on coal shipments. It advanced over $1,000,000 for freight in each of the years 1936, 1937, and 1938. These freight charges are recovered when petitioner collects from its purchasing *115 customers, which is usually from 30 to 90 days later. Petitioner often makes loans, some in large amounts, to its producer customers for the purpose of developing new mines or to finance mining operations. Generally these loans are repaid, but a few have resulted in considerable losses. In 1938 petitioner owned about 12 1/2 per cent of the stock of one of its principal producer customers, Winding Gulf Collieries, which in turn owned a controlling interest in another, the Lamar Colliery Company. The Justus Collins estate also owned stock of Winding Gulf Collieries, which, with petitioner's holdings, amounted to a controlling interest. About 860,000 tons of the 2,622,000 tons, approximately, of coal sold by petitioner in 1938 were produced by those two companies. The balance was furnished by producers in whom petitioner had no financial interest. Petitioner's president, Herman D. Everett, owned a small amount of stock in three of the producing companies and his wife owned 25 per cent of the stock in one of them. It was necessary for petitioner in the conduct of its business to maintain a cash balance of from $250,000 to $300,000 for the purpose of meeting its current liabilities *116 and payments to the coal companies. Its cash balance stood at approximately $296,700 at November 30, 1938, and was reduced to $56,600 at December 31, 1938. It was petitioner's policy to pay as much of its obligations as possible before the close of each year, thereby reducing its closing cash balance. One of its reasons for so doing was to avoid liability for local tax on corporate bank deposits as of December 31. By January 31, 1939, the cash balance had been increased to $352,000. At the close of the prior years 1929 to 1937 the cash balance varied from approximately $69,000 in 1933 to $227,000 in 1937. Petitioner's balance sheets as of December 31, 1938, and December 31, 1937, showed the following assets and liabilities: ASSETS
CURRENT ASSETS
Dec. 31, 1938
Dec. 31, 1937
Cash
$ 56,629.55
$ 227,286.93
Notes and Trade Acceptance
53,892.75
62,023.97
Accounts Receivable
954,555.11
615,248.75
Totals
$1,065,077.41
$ 904,559.65
INVESTMENTS
Stock (Other Corporations)
$ 245,328.66
$ 269,212.56
FIXED ASSETS
New River Coal Lands
194,995.32
196,224.76
Coal Yards at Cleveland
45,218.82
45,218.82
Furniture and Fixtures
7,241.65
5,867.14
Automobiles
8,332.77
5,392.24
Whole Equip. and Expt. Assets
5,541.50
6,632.57
OTHER ASSETS
Cash Value Life Ins.
18,400.00
16,700.00
Prepaid Expenses
2,290.66
1,595.76
TOTAL ASSETS
$1,592,426.79
$1,451,403.50
CURRENT LIABILITIES
Notes Payable $ $ Accounts Payable
235,469.78
201,176.52
ACCRUED ITEMS
Federal Income Tax
24,097.24
30,849.77
Capital Stock (4,000 shares)
400,000.00
400,000.00
Surplus
932,859.77
819,377.21
TOTAL LIABILITIES AND SURPLUS
$1,592,426.79
$1,451,403.50
*117 There was approximately $954,500 of accounts receivable at the close of 1938, $615,000 at the close of 1937, and comparable amounts at the close of the prior years to 1929. Petitioner's cash receipts and disbursements for the months of November and December 1938 and January 1939 were as follows: November,
December,
January,
CASH RECEIPTS
1938
1938
1939
Accounts Receivable
$609,484.56
$610,661.25
$594,613.88
Trade Acceptances and Notes
26,871.05
9,783.19
11,475.12
Claims
89.07
805.41
44.18
Dividends
5,046.00
Miscellaneous
835.89
8,424.74
1,510.64
Collections on January Sales
34,377.78
Total Cash Receipts
$637,280.57
$634,720.59
$642,021.60
CASH DISBURSEMENTS
Mines
$508,724.01
$764,876.94
$235,961.63
Freight
89,360.54
71,715.28
80,996.94
Vouchers
1,795.81
1,819.11
2,314.95
Current Expenses
19,237.33
19,392.86
19,274.69
Miscellaneous
1,343.67
3,300.45
1,192.56
Accrued Expenses
4,911.33
13,724.13
6,888.63
Total Cash Disbursements
$625,372.69
$874,828.77
$346,629.40
Most of petitioner's accounts receivable at the close of 1938 represented trade accounts of its regular customers which had already become due or would become *118 due January 20, 1939. Petitioner's bad losses were comparatively small, amounting to not more than $10,000 in any one of the years 1930 to 1938, inclusive. They amounted to only $3,820.25 in 1939. Petitioner had no contingent liabilities at December 31, 1938. It has been petitioner's custom for many years to leave the matter of dividends entirely to the discretion of its president. Since Herman D. Everett became president of petitioner he alone has determined whether petitioner would pay a dividend and, if so, when and in what amount, without consultation with any of the other directors or stockholders. He was solely responsible for the failure of petitioner to pay a dividend in 1938. His reasons for deciding against a dividend were based upon petitioner's reduced earnings for that year ($113,482.56 against $180,109.68 for 1937); the uncertain outlook of the soft coal industry, due to unsettled prices, threatened strikes, and other factors; the increasing difficulties of independent sales agencies in obtaining and holding contracts to assure them adequate coal deliveries; and petitioner's requirements for a large amount of cash with which to meet its current obligations and to *119 lend financial assistance to its producer customers. According to a schedule prepared by counsel for the respondent, and admitted in evidence without opposition of counsel for the petitioner, showing the surtaxes which would have resulted from a dividend distribution by petitioner of all of its 1938 earnings, the burden of such taxes would have fallen heaviest upon George R. Collins and Amy W. Venable (in the respective amounts of $21,097.07 and $11,601.05), neither of whom took any part in determining whether or not petitioner would pay a dividend. The increased tax liability of Herman D. Everett, who was solely responsible for the matter, would have amounted to only $3,960.94. [Opinion] We are convinced from the evidence as a whole that petitioner during the taxable year 1938 was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders. Cases like , and , cited by the Commissioner, are not controlling here. They involved facts comfortable to the requisites of section 102 *120 which are not found in the instant case. In the National Grocery Co. case, for instance, there was a long history of very large profits, only negligible dividends, numerous loans to the sole stockholder without payment of interest, and surplus accumulations far beyond any reasonable needs of the business. Similar facts obtained in the Chicago Stock Yards Co. case. We have none of those conditions in the instant case. As the evidence convincingly shows there was no accumulation of surplus during the taxable year 1938 beyond the reasonable needs of petitioner's business. The facts here are more like those in ; ; affd., ; certiorari denied, ; ; affd., ; and . We find and determine that petitioner was not availed of during the taxable year 1938 for the purpose of preventing *121 the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, within the meaning of section 102 of the Revenue Act of 1938. Decision will be entered under Rule 50.